1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ULISES SANCHEZ CARDENAS, | Case No. 1:15-cv-01405-DAD-EPG-HC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| WILLIAM MUNIZ, | |
| Respondent. | |

Petitioner Ulises Sanchez Cardenas is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition for writ of habeas corpus, Petitioner raises the following claims for relief: (1) ineffective assistance of counsel; and (2) denial of due process and a fair trial. For the reasons discussed herein, the Court recommends denying the petition for writ of habeas corpus.

## I.

## BACKGROUND

On July 20, 2012, Petitioner was convicted by a jury in the Stanislaus County Superior Court of first-degree murder (count 1) and two counts of assault with a firearm (counts 4 and 5). The jury found true the allegation that Petitioner committed the offenses for the benefit of a criminal street gang. On August 17, 2012, Petitioner was sentenced to an indeterminate term of twenty-five years to life plus ten years for count 1 with the sentences for the remaining counts to be served concurrently. People v. Cardenas, No. F065841, 2014 WL 2735968, at *6 (Cal. Ct.

1    App. June 17, 2014). On June 17, 2014, the California Court of Appeal, Fifth Appellate District,

2    modified the sentence to delete the ten-year gang enhancement and reflect a minimum parole

3    eligibility of fifteen years. The judgment was affirmed as modified. Id. at *19. The California

4    Court of Appeal denied a petition for rehearing. (LDs[1] 5, 6). The California Supreme Court

5    denied Petitioner's petition for review on September 17, 2014. (LDs 7, 8)

6         On September 17, 2015, Petitioner filed the instant federal petition for writ of habeas

7    corpus. (ECF No. 1). Respondent has filed an answer to the petition. (ECF No. 18).

8                                             **II.**

9                                 **STATEMENT OF FACTS**[2]

10       Shortly after 5:00 p.m. on July 29, 2009, Albert Schopp was seen leaving his
         house in Modesto driving his blue Chevrolet. Around 6:00 p.m., Stanislaus
11       County Deputy Sheriff Luke Schwartz was dispatched to Boulder Avenue and
         Broadway Avenue on the report of a shooting. He saw an older Chevrolet parked
12       in the middle of the roadway. It appeared that the rear window had been shot out.
         The victim was lying on the ground outside the driver's-side door with one foot
13       still in the car. Schopp died of a gunshot wound to the head.

14       Witnesses reported that a sport utility vehicle (SUV) had been following or
         chasing Schopp's car right before the shooting. Witnesses saw someone in the
15       SUV with a firearm, although accounts of the size of the weapon and the armed
         person's location within the SUV varied. Schopp's stepbrother, Erick Fernandez,
16       and Fernandez's friend, Dario Rios, had been riding in the Chevrolet with
         Schopp. Fernandez told a detective that a blue SUV had chased them; Schopp told
17       his passengers to get down and, after Fernandez ducked down, he heard one
         gunshot.
18
         Jose Cabrera, who lived in the area and observed the SUV chasing Schopp's car,
19       told the police about an earlier incident involving the same SUV. Cabrera noticed
         a group of six young people—boys and girls around 15 to 21 years old—walking
20       near a market across the street from Cabrera's house. The SUV was headed
         toward the market when Cabrera saw a boy from the group shoot at the SUV.
21       After the single gunshot, the young people on the street ran, and the SUV drove
         away. A few minutes later, Cabrera saw the same SUV drive by chasing Schopp's
22       car. Cabrera thought about 10 minutes had passed between the shooting at the
         market and when he saw the SUV chasing Schopp's car.
23
         The suspect vehicle was described as a green or blue Ford Expedition, and further
24       investigation led the sheriff's department to contact Carranza. Sergeant Brandon
         Kiely arrived at Carranza's house at 12:05 a.m. on July 30, 2009, and observed a
25       Ford Expedition parked in the driveway. A family member woke Carranza up,
         and Kiely asked him about the Expedition. Carranza agreed to go to the sheriff's
26

27  _____
    [1] "LD" refers to documents lodged by Respondent on December 24, 2015. (ECF No. 19).
28  [2] The Court relies on the California Court of Appeal's June 17, 2014 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

                                             2

office. Carla Gonzalez, Carranza's live-in girlfriend at the time, also went to the sheriff's office that night.

Detective Ken Hedrick interviewed Carranza, and the interview was videotaped. The interview lasted over four hours. Initially, Carranza denied any knowledge of either of the shootings.

Going into the interview, Hedrick did not know the names of any other suspects. At some point during the interview, Hedrick was given the name Ulises by a detective who interviewed Gonzalez,[n.2] and Hedrick asked Carranza about him. Eventually, Carranza admitted that Ulises was responsible for the shooting. Carranza provided Ulises's last name and showed Hedrick where he lived. Carranza said a person called Timber—later identified as Lopez—was riding in the back seat of the Expedition. Carranza explained that Sanchez[3] lived with Timber at Timber's family's house. After the interview, Carranza, who was 17 years old at the time, was sent to juvenile hall. Later, he was held in county jail. Sanchez and Lopez were arrested on the morning of July 30, 2009. Detective Darwin Hatfield interviewed Lopez, and the interview was videotaped. Lopez told the detective that he was in the Expedition, Carranza was driving, and Sanchez fired the shot.

> [n.2] According to Gonzalez's trial testimony, on the day Schopp was killed, she saw Carranza at around noon, when he gave her a ride to her mother's house. Carranza was driving the Expedition, and Sanchez was in the vehicle with him. The next time she saw Carranza was when he picked her up from her mother's house at around 9:00 or 10:00 p.m. At that time, he was alone.

Detective Francisco Soria interviewed Sanchez. Sanchez admitted he was a member of the Sureños and his moniker was Popeye. He reported that he had been at work early the previous day, then he went to the store and stayed at home the rest of the day. Sanchez said that his enemies were Norteños and anybody who disrespects him.

The next day, a criminal complaint was filed against Sanchez, Carranza, and Lopez. All three defendants were charged with murder, two counts of attempted murder, two counts of assault with a deadly weapon, and active participation in a criminal street gang. Sanchez was alleged to have personally and intentionally discharged a firearm.

Carranza and Lopez were housed in the same cell in jail. Lopez reached a plea agreement with the district attorney in 2011. He agreed to testify in exchange for pleading guilty to a single count of participation in a criminal street gang with an aggravated term of three years. Carranza also reached a plea agreement under which he was allowed to plead guilty to one count of manslaughter and one count of attempted murder with a nine-year prison term in exchange for his testimony.

On October 20, 2011, the Stanislaus County District Attorney filed a six-count information against Sanchez only. He was charged with the murder of Schopp (§ 187; count 1), the attempted murders of Fernandez and Rios (§§ 187, 664; counts 2 and 3), assault with a firearm upon Fernandez and Rios (§ 245, subd. (a)(2); counts 4 and 5), and active participation in a criminal street gang (§ 186.22, subd. (a); count 6). For counts 1 through 5, it was alleged that Sanchez personally used

---

[3] At trial, the parties, judge, and witnesses referred to Petitioner as Mr. Sanchez. Cardenas, 2014 WL 2735968, at *1.

a firearm (§ 12022.5 subd. (a)) and committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). For counts 1 through 3, it was also alleged that (1) Sanchez acted deliberately and with premeditation (§ 189); (2) he personally discharged a firearm, causing great bodily injury or death (§ 12022.53, subd. (d)); and (3) he was a principal of the offense, and at least one of the principals personally discharged a firearm, causing great bodily injury (12022.53, subd. (e)(1)).

A jury trial began on June 27, 2012. Lopez and Carranza were called as witnesses by the prosecution.

***Lopez's testimony***

Lopez testified that on July 29, 2009, he lived with his parents, his wife, and Sanchez. Lopez was home that day. Around 12:30 p.m., Carranza and Sanchez arrived at his house. They hung out for a while and drank beer. In the afternoon, they drove to a friend's house and then another friend's house. Carranza drove his Ford Expedition. They headed to a store near Boulder and Broadway. At the store, "[s]ome kids shot at" Carranza's Expedition. Carranza drove away, and Lopez noticed a bullet hole on the Expedition.

Lopez testified that Sanchez "said that he wanted to go get a gun, because he wanted to go and look for those kids, the one[s] that shot the vehicle." Sanchez gave Carranza directions to a house. Sanchez got a gun from a shed next to the house. It was in a piece of luggage like a backpack. Sanchez sat in the front passenger seat, and Lopez sat in the back behind Sanchez. Sanchez opened the backpack, and Lopez saw a rifle about 18 inches long.

They drove back to the market. They saw a car, "[l]ike an Oldsmobile." Sanchez said, "they're already looking for us to shoot us or something." Carranza followed the car. The car stopped at the side of the road, and Carranza also stopped. Lopez saw the driver trying to get out of the car and two passengers ducking down inside the car. Sanchez put a bullet in the weapon. Sanchez "got out of the window, sitting in the window with his legs still inside the [Expedition] and pointed the gun at the vehicle." Lopez heard one loud shot and saw the driver fall to the ground.

Sanchez handed a shotgun shell to Lopez and said it was the one he had just used. Lopez gave it back to Sanchez, who cleaned the shell with a rag and threw it out the window. They returned the gun to the shed. Then they went to Lopez's house. They did not talk about the fact that someone had just been shot. They talked about how Carranza's car had been shot and how to fix it. The three of them went to AutoZone. Sanchez drove his car, a green Cadillac, and they arrived at the store about 30 minutes to an hour after Schopp had been shot. They bought a package of Ford stickers, which Sanchez paid for. They went back to Lopez's house, and Lopez put a sticker on the Expedition to cover the bullet hole. They hung out for a while at Lopez's house, and at some point, Carranza left in his Expedition.

Lopez denied that he was an active gang member but agreed that he associated with Sureños and knew a lot about gang culture. He testified that Sanchez was a Sureño gang member in a subset called Southside Trece or SST. Sanchez believed the person who had shot Carranza's Expedition was associated with the Norteños. The victim was not the person who had shot Carranza's Expedition near the market, but the people in the car they had followed were also Norteño gang members.

***Carranza's testimony***

Carranza testified that in July 2009 he was a member of SST, a subset of the Sureños. Sanchez was his good friend, and he was also a member of SST. Carranza thought Sanchez had higher stature in the gang than he did because Sanchez had been a member of the gang longer. Carranza testified that Lopez was "[j]ust an associate" of the Sureños, not a member of the gang, which meant he hung out with Sureños but did not do anything to benefit the gang.

Around 1:00 p.m. on July 29, 2009, Carranza drove his mother's Ford Expedition to Lopez's house. After about 20 minutes, Carranza and Sanchez went to Carranza's house. Carranza and his girlfriend, Gonzalez, had a baby boy. Carranza and Sanchez took Gonzalez and the baby to Gonzalez's father's house. After they dropped off Gonzalez and the baby, Carranza and Sanchez drove back to Lopez's house. They drank beer and hung out, and after about two hours, Carranza, Sanchez, and Lopez went to a neighborhood called the O.G., which includes the area of Boulder Avenue and Broadway Avenue. They were driving near a liquor store on Boulder when Carranza saw a group of about five pedestrians. Sanchez called them "busters," which is a derogatory word for Norteños. About a minute later, Sanchez told Carranza they were being shot at, and Carranza "[t]ook off." They went to a house to get a gun, and then they drove back to the O.G. to "get some pay back."

When they returned to the O.G., Carranza saw three people in a car. Carranza recognized Schopp from the neighborhood and considered him an enemy because he was a Norteño. Carranza followed Schopp's car. Schopp's car stopped, and Carranza stopped directly behind him. Then Carranza saw Sanchez "come out of the window" and fire a shotgun. Carranza thought the shotgun was about two feet long. Carranza took off, and they dropped the gun off at the house where they had picked it up. They went to Lopez's house. Carranza had the idea to cover the bullet hole on the Expedition with a sticker. They went to AutoZone in Sanchez's Cadillac. Carranza testified that he paid for the Ford stickers. They returned to Lopez's house and Carranza stayed for a while. Then he left to pick up Gonzalez and their baby and they went home.

***Other evidence at trial***

Witnesses' observations of the SUV chasing Schopp's car varied in many of the details. Jose Cabrera testified that he saw a person in an SUV "leaning out the window with a shotgun...." The shotgun was about three feet long. Cabrera said the person with the shotgun was in the back seat behind the front passenger. Cabrera's girlfriend saw an Expedition chasing Schopp (whom she knew) and did not see any passengers in Schopp's car. She saw "a guy in the backseat [of the Expedition] with a gun pointed out the window." She described the gun as a small handgun about eight inches long.

Antonio Cortez lived on Boulder Avenue near Broadway at the time of the shooting. He observed a light blue Caprice going up and down the street "at least four, five times...." He saw a greenish Explorer following the Caprice. He only saw a driver and a front passenger in the Explorer. The two vehicles turned left onto Broadway, he lost sight of them, and then he heard one gunshot. After the gunshot, Cortez saw the Explorer drive in reverse on Broadway, make a U-turn, and head west on Broadway. As the Explorer backed up, he noticed the front passenger door was being closed. It appeared the passenger was not seated "but getting in about to be seated...." Cortez's brother was at Cortez's house that day.

He testified that someone in a Ford SUV "stuck ... one hand out the rear passenger side window and then fired the shot." He described the firearm as a small, semiautomatic handgun, not a shotgun or long rifle.

Another witness told a deputy he saw three people in an Expedition, the driver fired a handgun, and the rear passenger yelled something out the window. Fernandez, who was in the car with Schopp, told Detective Hedrick that the shot came from the front passenger's side of the SUV.

Deputy Sheriff Jon McQueary testified about shotgun ammunition. A shotgun shell usually holds many pellets of a certain size and wadding to hold the projectiles in place. When a shotgun shell has only one projectile instead of numerous pellets, the projectile is referred to as a slug. At the crime scene, a fragment of lead was found inside Schopp's car along the dashboard on the driver's side. McQueary found an expended shell casing on Boulder just north of the market at Broadway. A pathologist also recovered plastic wadding and lead fragments from Schopp's brain. Based on his training and experience, McQueary believed a single lead slug from a shotgun went through the rear window of Schopp's car, passed through Schopp's head, struck the front windshield, and then fell in the dashboard area. A shotgun shell can only be fired from a shotgun, not from a standard handgun. A search of Lopez and Sanchez's house was conducted on July 30, 2009. In Sanchez's bedroom, a deputy found in a dresser drawer a shotgun shell with a slug.

Sergeant Kiely processed the Ford Expedition found in front of Carranza's house. Carranza's fingerprints were found on the exterior of the rear passenger-side cargo window, and Lopez's fingerprints were found on the exterior of the rear passenger window. Kiely observed a Ford sticker on the rear passenger-side quarter panel of the Expedition. He removed the sticker and found a piece of tissue paper wadded up in a hole that appeared to be a bullet hole. The front passenger seat of the Expedition was pushed all the way forward. Sanchez was five feet two inches tall and the shortest of the three codefendants.

Kiely also searched Sanchez's Cadillac. In the center console area, he found a receipt from AutoZone for two Ford stickers with a purchase date of July 29, 2009. McQueary went to an AutoZone store on Paradise Road, a couple miles from the crime scene, and was able to recover a security camera video recording from the evening of July 29, 2009. The video and time stamp showed Sanchez, Carranza, and Lopez in the store buying stickers at 6:36 p.m. McQueary also found Ford stickers for sale at the store that matched the sticker that covered the bullet hole on the Expedition.

Detective Chad Bankston testified about the Sureño street gang. Southside Trece is a subset of the Sureños in Stanislaus County. The Sureños' primary activities include homicide, drive-by shootings, drug dealing, possession of firearms, carjacking, extortion, and intimidation of witnesses. Their enemies are the Norteños, which is also a criminal street gang. The neighborhood known as the O.G., where Schopp was killed, is a high crime area. It was once run by Norteños, but now there are Sureños and Norteños in the neighborhood. Broadway and Boulder is the Norteño part of the neighborhood. Based on his review of law enforcement information, Bankston determined that Sanchez, Carranza, and Lopez were all active Sureño gang members, and Schopp was a Norteño gang member. Among the three codefendants, Bankston believed Sanchez had the most status as a Sureño.[n.4] He opined that the shooting of Schopp benefited the Sureños because it helped the "domination of the neighborhood with ... fear and

6

intimidation" and was direct retaliation for the earlier shooting of Carranza's vehicle in front of the market, which Sanchez, Carranza, and Lopez understood to have been committed by Norteños. Bankston testified that, based on their status in the gang, Sanchez and Carranza had an obligation to retaliate after Carranza's vehicle was shot by suspected Norteños. If they failed to retaliate, it would have been a sign of weakness and they would have been punished by their own gang.

> [n.4] Bankston explained, "Based on the contacts . . . with law enforcement, how far back he's been claiming to be in a Sureño criminal street gang, crimes he's been guilty of, the fact that he's been sentenced and served time in juvenile hall, those are things that are going to elevate your status." Sanchez also had "SST" tattooed on his chest, which he "probably earned." In contrast, there was "[n]ot much" gang information related to Lopez, and he had no gang tattoos.

At the close of the prosecution's case, the trial court granted Sanchez's section 1118 motion and dismissed counts 2 and 3, the charges of attempted murder.

In her closing statement, Sanchez's counsel argued that Carranza and Lopez were not credible witnesses and, without their testimony, there was no evidence Sanchez was in the Expedition when Schopp was shot. She suggested that, during the initial interviews, Carranza and Lopez told the detectives what they wanted to hear, rather than the truth, and Carranza's and Lopez's stories were not completely consistent with each other because they were "just making it up...."

Cardenas, 2014 WL 2735968, at *1–5 (footnote omitted).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Stanislaus County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, the "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

The AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

# IV.

# REVIEW OF CLAIMS

## A.  Ineffective Assistance of Counsel

In his first claim for relief, Petitioner asserts that trial counsel was ineffective for failing to request that the trial court exclude the coerced testimony of Isidro Carranza and Rafael Lopez. (ECF No. 1 at 6, 26).[4] Respondent argues that the state court's determination that Petitioner was not denied effective assistance of counsel was reasonable. (ECF No. 18 at 17).

Petitioner raised ineffective assistance of counsel on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. (LDs 1, 4). The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 7, 8). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim with respect to counsel's failure object to the testimony of Carranza and Lopez, the California Court of Appeal stated:

> ### I.  Ineffective assistance of counsel based on failure to move to exclude testimony
>
> Sanchez contends the trial court should have excluded the in-court testimony of Carranza and Lopez because coercive police interrogation techniques rendered it unreliable and its admission in evidence therefore denied him his right to due process of law. Acknowledging that his trial counsel did not request exclusion of this testimony, Sanchez further asserts that his trial counsel rendered ineffective assistance of counsel by failing to move to exclude Carranza's and Lopez's testimony.
>
> To prevail on an ineffective-assistance-of-counsel claim, Sanchez must show that his trial counsel's performance was deficient and that the deficiency caused him prejudice. (*People v. Cowan* (2010) 50 Cal.4th 401, 493, fn. 31.) An attorney's failure to move to exclude admissible evidence does not amount to ineffective assistance. (*People v. Berry* (1990) 224 Cal.App.3d 162, 170 [where evidence was admissible, "any motion to have it suppressed would have been futile"; "[t]herefore, counsel was not ineffective when he failed to make the motion"].) Accordingly, to assess Sanchez's claim of ineffective assistance of counsel, we consider whether Carranza's and Lopez's testimony was inadmissible because of coercion.

---

[4] Page numbers refer to the ECF page numbers stamped at the top of the page.

### *A. Factual background*

#### *1. Interviews with detectives in 2009*

As we have mentioned, Hedrick's interview of Carranza and Hatfield's interview of Lopez were videotaped. Edited videos of the interviews were played for the jury, and DVD' and transcripts of the interviews are part of the record on appeal.

#### *a. Carranza*

At the beginning of the interview, Hedrick established that Carranza had a girlfriend, Gonzalez, they intended to get married, and they had a four-month-old baby boy. Hedrick read Carranza his *Miranda* rights and the interview continued. Carranza initially claimed that he spent the afternoon with Gonzalez. Hedrick reminded Carranza there had been a shooting and stated, "We have reasons to come to your house tonight to talk to you."

Carranza denied going to the O.G. Hedrick urged Carranza to tell the truth and told him to think of his girlfriend and his baby. Asked how the Expedition got a bullet hole, Carranza first claimed that it was already there and probably his "sisters or the aunt or mom" put the sticker over the hole. Informed that his relatives denied the sticker was already there, Carranza responded, "I don't know. Had a car crash. That's it." Hedrick asked if Carranza would take a lie detector test and told him he knew Carranza was lying. Carranza asked how he knew, and Hedrick replied, "Because I already know the answers. I know what happened. I'm now coming to you and I'm giving you the chance to tell the truth." Hedrick continued: "[W]hen you lie and ... you lie, then pretty soon you lied so much that you get yourself in trouble and it's harder to fix it. When you tell the truth, then we can try to fix what the problem is. People make mistakes." Carranza then admitted that his car had been shot in the O.G. but claimed he was alone at the time.

Hedrick told Carranza that the market at Boulder and Broadway had cameras outside and that was how law enforcement knew his Expedition was involved. Hedrick said that, when the interview was over, he would show Carranza the video from the market,[n.5] but first he "want[ed] to give [Carranza] the chance to tell the truth." Hedrick indicated that he knew Carranza went back to the O.G. and chased a car. Hedrick also said, "I can tell that you're not a bad guy. I could tell right away. I talk to a lot of people." Hedrick observed that Carranza's eyes were starting to water and told him it was okay to be scared.

> [n.5] In fact, there was no video. The market did have a security camera, but a deputy sheriff was unable to recover any video of the shootings because the camera was not recording during the relevant time.

Hedrick asked if the "guys in the car" (Schopp and his passengers) shot at Carranza's car. Carranza responded, "I know I got shot at and there was just some guys walking." At this point, Hedrick asked what Ulises was going to tell law enforcement, and Carranza responded, "Who?" Hedrick continued to remind Carranza of his family and to suggest it was all a mistake: "Why do you want to do this to your family? You got to think about your family. There was people out there. They saw it. We can start trying to fix it. Somebody got killed. I know that's not what you wanted to happen. But if you lie, then it looks like you're a bad guy and that it wasn't a mistake. But when you tell the truth, then we can explain ... why it happened and what happened. And if you're really sorry for

what happened, then you can tell the truth. And we can try to fix the mistake.... It was a mistake, huh?"

Carranza insisted that he "didn't do nothing." Hedrick asked who else was with him when he and his girlfriend left their house, and Carranza mentioned that he "gave some guy a ride home" but asserted that he did not know the person's name. Hedrick stated that Gonzalez knew the person's name and, further, she "tells us a different story." The questioning continued as follows:

> "[Hedrick]: So the question now is when we go and arrest [Sanchez], is he going to say that he was the shooter or is he going to say that you were the shooter?

> "[Carranza]: I don't know.

> "[Hedrick]: I don't know either. This is ... your chance. Before we talk to him, they're out looking for him right now. And they're going to find him. So this is your chance, your chance to tell me the truth before he does. Don't be stupid. You're not stupid. Don't make a mistake again.

> "[Carranza]: Everything stay the same."

Hedrick urged Carranza to admit he was driving the Expedition when Schopp was shot: "You were just driving the car, huh? You weren't the shooter, huh? Hey, come on. Take the chance here. I'm giving you this chance. Don't blow it. You were just driving the car; right?" Hedrick told Carranza that Gonzalez was worried about him and he should "do the right thing for her...." He said, "If you were just driving the car, then you got to tell me. Make it better for yourself. Make it better for yourself before [Sanchez] comes in and he makes it better for himself.... Tell the truth so you can feel better." Carranza denied driving the Expedition.

Hedrick asked if Ulises was the shooter and speculated that Carranza did not know that Ulises had a gun. Hedrick suggested possible scenarios to Carranza: "Did you know he was going to shoot? Was he supposed to just shoot and just scare them? Nobody was supposed to get hurt? If that's the case and it was an accident, you got to tell me. Because otherwise I got to think you guys were trying to kill somebody."

Hedrick then indicated that Ulises had been arrested and warned Carranza: "Once they start talking to [Sanchez] and he wants to make a deal, and he says that you're the shooter, game's over. Do you understand? If he says that you were the shooter, you're going to go to jail and my report is going to show how you lied and lied and lied and lied, and I gave you all kinds of chances. That's not going to look good for you."

The interview continued in this manner with Hedrick suggesting what happened, urging Carranza to tell the truth, and reminding him to think of his family. Hedrick asked, "[W]as it [Sanchez] that shot or was it someone else in your car?" He asked Carranza who he cared more about, his family or Ulises, and Carranza answered his family. Hedrick told Carranza to prove he cared about his family by doing "the right thing" and telling the truth.

Carranza asked, "What's a deal?" Hedrick replied, "Well, maybe [Sanchez] wants to say that he was driving the truck and that you had the gun and he didn't know." Carranza said that was a lie.

Detective Hatfield entered the interview room to perform a gunshot residue (GSR) test.[n.7] Hatfield explained to Carranza that powder comes out of a gun when it is fired that can "get on you" if you shoot a gun or are near a person who shoots a gun.

> [n.7] At trial, Hatfield testified that the main purpose of administering the GSR test was "investigative," not for its own evidentiary value. He explained, "[W]e ... put them in a mindset leading them to believe it did come back positive so the wheels turn in their head that we know something." On cross-examination, Hatfield stated that he conducted GSR tests on Carranza and Lopez but did not remember giving the test to Sanchez. Hatfield also admitted that he did not read the instructions for the GSR test. An expert for the defense testified that, in use of a GSR test kit, it is recommended to take samples first using the stubs (which were described as similar to heavy duty double stick tape) and then using the swab. Using the swab before the stubs risked destroying evidence. Hatfield, however, had used the swab before the stubs with both Carranza and Lopez. The defense expert further testified that the samples from Carranza and Lopez had particles that could have come from the discharge of a firearm but could also have come from other sources.

Hatfield left. At this point, Carranza asked Hedrick what it would mean if, unknown to him, someone in his car had a gun and suddenly pulled it out and Carranza "just tr[ied] to leave. Like so nothing will happen." Hedrick explained that might be an accessory "as opposed to being someone who's a killer." Carranza asked what the legal consequences would be under that scenario, and Hedrick responded that "who goes to jail and for how long" was not up to him. Hedrick told Carranza he had gunpowder on his hands[n.8] and they were going to test the Expedition for gunpowder. While Carranza still denied that he chased a car in the O.G., he expressed interest in a "deal" with the district attorney. Hedrick told him, "I can't guarantee that the DA will make you a deal. [¶] ... [¶] But I can guarantee that if you're not truthful, there won't be any deals."

> [n.8] To the extent Hedrick suggested the GSR test results conclusively showed Carranza had been near a gunshot, this was not true. The defense expert found no conclusive evidence of gunshot residue in either Lopez's or Carranza's samples. Trial testimony suggests the sheriff's department did not submit Carranza's and Lopez's GSR kits for analysis as Hatfield testified that the Department of Justice would not test the kits because the subjects were apprehended many hours after the shooting.

After further questioning, Carranza admitted that someone in his car had a gun. Carranza observed, "The thing is what if I cooperate and then things still [go] bad." Hedrick responded, "It can't go any worse." Gonzalez was brought in to see Carranza, and she told him to tell the detectives everything.

Carranza told Hedrick that Ulises was in the front passenger seat. Carranza continued to deny that he chased a car and denied stopping behind a car. Hedrick stated: "You had to have stopped, otherwise you would have [run] into the car. If you're going to cooperate and want the DA's office to help you out, you got to cooperate all the way. All the way." Carranza said that Ulises shot out the window

of the Expedition. Hedrick asked how many times he fired. Carranza responded, "It was just two—I think I didn't even hear nothing." Asked again, Carranza said, "I just remember—I think I just heard one." Hedrick then explained, "I know he got shot one time. But I wanted to see if you were going to tell me the truth."

Hedrick drew a map of the area, and Carranza showed where Schopp was shot. Carranza confirmed that Ulises was a Sureño and admitted that he associated with Sureños. He thought the people in the car they chased were Norteños. Carranza reported that Ulises's street name was Popeye but denied that he himself had a gang moniker. He also denied that he had any gang tattoos although he had a tattoo of three dots, which is associated with Sureños. He thought the people who shot his Expedition in the O.G. were Norteños.

Hedrick next asked Carranza who was sitting in the back seat of the Expedition. Carranza admitted there was a passenger in the back seat but claimed he just met him that day. Hedrick asked for Ulises's last name, and Carranza told him it was Sanchez.

Hedrick left the interview room, and Hatfield entered. Hatfield told Carranza he was not being truthful about not knowing who the back-seat passenger was. Hatfield told Carranza he had to be totally honest: "You're doing good. You came a long way tonight. Okay? It takes a big man to do that. You got to understand our job. Our job is going to find out who that third person is. Okay? Now whether or not you want to be totally truthful, remember what I said, you have to be totally truthful if you want the DA to try to work a deal with you. Totally truthful. Okay?"

Hatfield accused Carranza of going back to the O.G. "looking for retribution, basically to get back at somebody for shooting your mom's car." Carranza denied looking for anyone and said he was "just driving." The detective told Carranza they were done and Carranza was "going to get booked with one count of homicide and two counts of attempted homicide." He suggested that a deal with the district attorney was unlikely. Carranza responded, "I'm cooperating." Hatfield then told Carranza that Sanchez had admitted he was the shooter and, further, Sanchez said he shot because Carranza wanted him to shoot because Carranza was angry about his car.[n.9] Carranza denied telling Sanchez to shoot.

> [n.9] Hatfield also reported that Sanchez said he did it because he was Carranza's friend. In fact, Sanchez had not admitted to anything as he was not even in custody at the time. The detectives only learned of Sanchez's whereabouts from Carranza.

Hatfield observed, "I know you wanted to shoot their car. I think it might have been just an accident that the guy got shot." Carranza responded, "Yeah." Carranza said the gun was "[p]robably a shotgun." The detective suggested: "The only reason that you turned toward them was so your buddy could shoot the gun at their car. Am I right or wrong? The only reason you turned toward them [i.e., turned left onto Broadway] is so [Sanchez] could shoot the gun and hit their car with it. And the driver just happened ... to get killed. Am I right or wrong?" The transcription of Carranza's response reads "[u]nintelligible," but Carranza appeared to nod his head affirmatively. The detective understood Carranza's response as agreement because he next said, "Okay. Thank you."

Carranza told Hatfield the person in the back seat was called Timber. Hatfield said that Sanchez was "coming up with a totally different statement than what"

Carranza was saying and Sanchez was "actually being truthful" because "he's feeling sorry that the guy got shot." Hatfield told Carranza they already knew who the person in the back seat was and Sanchez said the person was Carranza's friend. Carranza maintained that he did not know the person's name, other than Timber, but admitted that he picked up and dropped off Sanchez and Timber at their house. The detective said: "I want to tell you something. Okay? You're going to be charged with one count of homicide, two counts of attempted homicide. We're also going to talk to the DA about you because you finally became honest.... [¶] ... [¶] So that's going to work in your benefit. Like I said earlier, I can't guarantee you anything...."

Carranza was then driven to the area where Lopez and Sanchez lived, and he pointed out their house.

### b. Lopez

Detective Hatfield interviewed Lopez on July 30, 2009. The interview lasted over two hours. Hatfield began by saying he already knew the answers to the questions he was going to ask. He said, "The thing is, I want to treat you as a witness, not as a suspect. [¶] ... [¶] But if you're not truthful,—[¶] ... [¶]—you're going to be treated as a suspect. You're going to go to jail today." Hatfield continued: "Okay? Simple as that. If you're truthful, we might be able to work a deal out with the DA's office. Okay?" Lopez said, "Okay."

Lopez told Hatfield that Sanchez was his friend. He admitted he used to be called Timber. Hatfield asked, "You still [gang] bang a little bit?" and Lopez answered, "Yeah, but I'm just on the side." Lopez was 22 years old and he lived with his parents. His girlfriend, who was over eight months pregnant, also lived with him. (At trial Lopez referred to her as his wife.)

Hatfield observed that Lopez was not at the sheriff's office "on [his] own free will" and then read him his *Miranda* rights. Hatfield said he knew Lopez was "going to try to BS" him and repeated that he already knew the answers to the questions he was about to ask. Hatfield further told Lopez: "I know you were with those two guys last night, yesterday afternoon when somebody gets shot. [¶] ... [¶] ... I know you're not the shooter. Okay? Do you understand that? I know you're not. We know [who] is. Okay? And we know [Carranza] is the driver, so it puts you as being a passenger. But I want you to understand something because of your gang affiliation, okay, we could tie you into it too. We don't want to do that. Okay? We want to try to work as—you as a witness, but it depends on how truthful you are here."

Hatfield's interview of Lopez proceeded in a similar manner to Hedrick's interview of Carranza, with Lopez initially denying any involvement and later admitting he was with Carranza and Sanchez when the shooting occurred. Hatfield also followed the interview techniques Hedrick had used with Carranza. Hedrick asked whether Lopez was having a boy or girl and told him to think of his baby and family. He (falsely) said there was video from the market that showed "you guys drive by when the shooting happens both times." He said that Lopez's girlfriend was being questioned and there was a "total different picture" from what Lopez was saying. He mentioned a lie detector test and administered a GSR test.

Hatfield told Lopez that they had already talked to Carranza and Sanchez and witnesses at the scene and suggested that the killing may have been a mistake:

"The other thing too is I don't think ... [Sanchez] meant to shoot the victim. I think he was just shooting at cars in retaliation for [Carranza's] car getting shot. Okay? But unfortunately, somebody got shot and they died. Okay?" At that point, Hatfield asked Lopez to tell him in his own words what happened the previous day.

Initially, Lopez said that Carranza and Sanchez had been at his house in the afternoon and then they left to visit Sanchez's family in Fresno. Hatfield said he was about done, and Lopez would be going to jail for homicide and two counts of attempted homicide.

Hatfield told Lopez he was "worth saving" but was about to make a bad decision by not telling the truth. He warned Lopez that the punishment for murder was life in prison and "if we can prove premeditation, it'd get you the death penalty."

Hatfield said: "[Y]ou're about not to see your family for the rest of your life. I can tell that's hurting you. I can see it in your eyes, dude. Is there something else you want to tell me about yesterday?" Lopez responded: "No. Well, you guys saw everything. That's what it is." Lopez asked why they were still asking questions when "[y]ou guys know what happened." Hatfield stated that, by not telling the truth, Lopez was "taking the gang side of life." Then he asked: "Just think about if your old lady gets with a [Norteño] and your kid is raised as a [Norteño]? Wouldn't that just get at you?" Hatfield continued: "I'm about ready to walk out this door because I'm tired. I want to go home. I'm going to go out and fill out some paperwork to book your ass in jail. You decide you want to tell me the truth, you knock on that door. I'll give you an opportunity. But I guarantee you, once you leave here in cuffs and go to jail, no further opportunities."

Lopez denied being in Carranza's Expedition, and Hatfield said they were going to test it for DNA. Hatfield told Lopez he already knew a shotgun was used in the shooting. He talked about DNA testing and said: "So each little thing we're doing here is one more nail in your coffin. You need to understand that. I'm about ready to put you away for life. Okay?" Lopez responded, "I didn't shoot nobody though." Lopez indicated that he thought he had only been brought in as an eyewitness. Hatfield explained that Lopez was not just a witness, he was a gang member hanging out with two gang members committing a crime.

Lopez asked, "And what's the only way I can do so I can get out?" Hatfield answered: "Tell the truth. Tell the truth. It's the only way. Now, is that going to stop you from going to jail today? Probably not. But I'm going to tell you what the DA most likely will do when it starts going to court. Guess who he's [going to] offer a deal to? The one that's telling the truth, the one that's less culpable at committing a crime. You're the less culpable because you didn't pull the trigger. You're less culpable because you didn't drive the car. You're just a passenger."

Lopez claimed he did not know what was going to happen and he could not say anything or he would get in trouble with the gang. He did not want to be called a rat. Hatfield said: "I can't help you out unless you tell the truth. And the only way I can help you out if you tell the truth, I'll go talk to the DA. Then it's the DA's decision whether or not to offer you a deal." Lopez responded that he was "still going to [be] locked up no matter what." Hatfield told him: "You're going to get locked up for a little while. Okay? Whether or not you go to prison, or you can go to county for a little while, that's up to the DA. The DA's the one that makes the ultimate decisions of how you get charged—whether you get charged at all. We

can put you in jail today. They say, 'No, we're going to treat him as a witness,' and release you in 48 hours."

Hatfield asked, what if Sanchez said he was not the shooter and Lopez was? Lopez replied, "You guys got the video." Hatfield said they only had video of the people in the Expedition, not of the actual shooting.[n.10] Hatfield further told Lopez that a witness said the person in the back seat was the shooter.

> [n.10] Again, we note that this was not true; there was no video from the market.

Lopez said, "I'll give them to you" and stated that he wanted to get out of jail that day. Hatfield said that was not going to happen and Lopez was going to jail. Lopez offered he would "say whatever" to get out that day. Again, Hatfield told him that would not happen and, "The only thing I can tell you is that if you're honest, the DA will look at it and maybe offer you a deal." Hatfield continued: "Now, you have ... two choices, and ... you need to make it, not me.... You can either spend the rest of your life in prison, or you take a shot at telling the truth, and hopefully spending some time with your kid and your future—I'm sure you're probably ... going to get married—your future wife.... [¶] ... [¶] ... Think about seeing your mom and dad at visiting times, not being able to touch them, only being able to see them through glass and talk to them on a little phone."

At this point, Lopez said he did not want anyone hearing if he said something. Hatfield assured him the walls were soundproof. Then Lopez told the detective that Carranza was driving and Sanchez had the gun. He said Sanchez shot once. Asked why he shot the gun, Lopez responded, "Because he had got shot first, that's why." Hatfield asked why he shot that specific car. Lopez answered, "He was not going to shoot nobody, but they—he thought that they were after us, because they were looking for us already." Lopez stated that he did know where the gun came from. Hatfield told Lopez that he was "doing the right thing." Hatfield said he would go to bat for Lopez with the district attorney but he could not guarantee anything.

### 2. Interviews with investigator in 2011

Froilan Mariscal is a criminal investigator with the Stanislaus District Attorney's Office assigned to its gang task force. Carranza and Lopez agreed to provide statements about the shooting and, in December 2011, Mariscal interviewed them individually at the county jail. The interviews were recorded and played for the jury.

### a. Lopez

Mariscal interviewed Lopez first. He explained that Lopez's attorney had given him permission to talk to Lopez because "they're trying to get a deal worked out." He warned Lopez this was his only chance to be completely honest.

Mariscal asked Lopez to tell him everything that happened on July 29, 2009. Lopez said that Sanchez and Carranza arrived at his house around noon and they drank beer in the backyard. They decided to go to a friend's house, but Lopez claimed he did not know the person's name. The friend was not at his house, and someone at the house told them to try another person's place. Lopez said he did not know this person's name either. The second place was a trailer near Seventh Street. The friend was not there either. Then Carranza, Sanchez, and Lopez went to a store. They stopped and parked on the side of the street. A teenager pulled a

gun and he shot once. Carranza, Sanchez, and Lopez went back to the friend's house. Then they drove by the store again on their way back to Lopez's house. Lopez said he felt the car going out of control and then Sanchez told him to duck. Lopez heard a gunshot. He looked up and saw Sanchez with a gun.

At this point, Mariscal told Lopez there were "a lot of blanks" in his story, which indicated that Lopez was not being completely honest with him. He said, "That tells me that you're leaving out a lot of the details that we need to go forward with your statement." Mariscal asked who brought the gun in the car, and Lopez said it was Sanchez. Lopez said Sanchez was talking on the phone and the person he was speaking to told Sanchez where he could find a gun. Lopez described the location of a house with a shed where they went and Sanchez picked up the gun. He said it was in a bag like a backpack or duffel bag.

During the interview, Lopez began crying and saying how fearful he was for his family. He told Mariscal he was afraid of retaliation if he told him the truth. Mariscal said that he understood and everybody gets scared.

Lopez reported that Sanchez said they would look for the teenager who shot at them. Sanchez said he would take the gun from the teenager so it could be used by SST. Sanchez knew the teenager was a Norteño, and he "had a problem with him before." Sanchez also knew that the victim was a Norteño. Lopez described seeing Sanchez shoot out the window.

Lopez also identified the friend who was not at home as Clumsy and the person who lived in the trailer as Chicken Legs. He thought the person from whose house they retrieved the shotgun was called Yogi.

Lopez denied that he had a gun that day. He also denied that he touched Sanchez's firearm. He said that Sanchez caught the shotgun shell with his hand and handed it to Lopez. Later, Sanchez threw the shell out the window. Asked what happened to the shotgun after the shooting, Lopez answered that Sanchez "probably took it back to his friend's house," but Lopez was not there.

### b. Carranza

After Lopez's interview, Mariscal interviewed Carranza. At the start, Mariscal told him: "I can tell you that the DA on the case, he's thinking about working out a deal with you; right? ... [¶] ... [¶] ... Okay. There ... may have been some holes with your statement, and that's why I'm here. This is your opportunity to be completely 100 percent honest with everything. Okay?"

Carranza said he went to Lopez's house to visit Sanchez. Then Carranza, Lopez, and Sanchez went to visit a friend, Vicente. From there, they headed to "some other people's house." Carranza said they passed a liquor store on their way to "the second guy's house." Sanchez rolled down his window and "said some things" to a group of pedestrians, and then they were shot at. Carranza drove away. Carranza reported that he saw Sanchez pull a gun out of his pants and he backed up and tried to leave. Carranza said he did not know what happened to the gun.

After hearing Carranza's version of events, Mariscal told him: "It's very easy for me to tell when somebody is not being completely honest with me just like you are right now. Okay? It's very easy for me to tell based on all the evidence what happened in this case based on the investigation that we've been doing for a

couple of years already. And for you to come in here right now and to not be completely honest about what really happened, that's wasting my time and it's wasting your time. Okay?" He continued: "This story is the story that you want me to believe to minimize your culpability, to minimize [Sanchez's] culpability. This story is because you're hiding things, it's full of holes, and it's not believable." Mariscal said: "This is your opportunity. I mean, if you want to take it, you can take it." At this point, Carranza responded, "I'll tell you how it happened."

Carranza said that Sanchez called Vicente and said he was going to come over. The three of them went to Vicente's house. From there, they were going to go to "another dude's house." On their way to the second house, they "went to the liquor store just to drive around...." They saw a group of people, and Sanchez said to pull over because he saw Norteños. Sanchez screamed out, "'Fucking busters.'" Carranza saw a person pull out a gun from his shirt, and Carranza drove away. They drove to Yogi's house and Sanchez got the gun. Carranza said he had it in his shirt. They went back to the area where the Expedition was shot. Sanchez wanted to find the kid who shot at them. Then they saw the victim, whom Sanchez knew. Carranza chased the victim for around 30 seconds. They passed the liquor store and turned. Carranza saw the victim get shot. They dropped the gun off at Yogi's house and then went to Lopez's house. Mariscal asked what kind of gun Lopez had, and Carranza answered that Lopez did not have a gun. Carranza said he thought Yogi's name was Marcos.

Mariscal asked Carranza some questions based on what Lopez had told him. He asked if Sanchez caught the shell after he fired the shot. Carranza responded that he threw it away. Mariscal asked if he gave it to Lopez, and Carranza said no. He asked if they went to Chicken Legs's house, and Carranza said no.

### 3. Trial testimony

Through cross-examination, Sanchez's counsel challenged the credibility of Carranza and Lopez and questioned the detectives' interview techniques.

#### a. Carranza

On cross-examination, Carranza admitted that, during the interview with Hedrick, he was trying to find out if there was something he could confess to that would be less serious than murder. Carranza wanted to know what the punishment would be for accessory because he was trying to decide if he would confess to something. He agreed Hedrick mentioned that Sanchez had a gun before Carranza told him that Sanchez had a gun. Carranza tried to minimize his culpability by giving Hedrick the impression that he would never have anything to do with guns.

#### b. Lopez

On cross-examination, Lopez agreed that, during their interview, Hatfield mentioned a possibility of a deal with the district attorney. Hatfield told Lopez "he would see what he could do," and that was what Lopez wanted. Sanchez's counsel asked, "Which story do you have to tell in order to get out of custody?" Lopez answered, "Say the truth." The questioning continued:

"[Counsel]: Q. Do you have to convince this jury of your last story to Detective Mariscal to get out of the custody?

"A. I just need to give the truth, and [that] depends on them if they give me a chance to live once again and be with my family.

"Q. You think it's up to the kindness of the District Attorney's heart because they want you to go home to your family?

"A. No. It's not that. I know I did screw up some. I was talking about other things. Everybody makes errors, but at this time it's not the time to be lying.

"Q. Right now is not the time to be lying?

"A. No."

Lopez agreed that his "number one goal in this case ... is to get out as soon as possible...." He admitted that, during the interview with Hatfield, Lopez said he would be truthful and then continued to lie. Sanchez's counsel pointed out that during the interview Hatfield told Lopez that Carranza was the driver and Sanchez was the shooter before Lopez had given Hatfield any information. Then Hatfield told Lopez that a witness said the back-seat passenger was the shooter. Lopez admitted that this made him nervous and it was at that point that he identified Sanchez as the shooter.

Sanchez's counsel asked if Lopez lied to protect someone else or to help himself. Lopez responded: "I said it because everything that the detective was saying, it was making sense to my head, everything how it happened was going, so I had no choice but to say it because basically somebody was saying something already."

On redirect examination, the prosecutor followed up on what Lopez meant when he testified that detective Hatfield was making sense. Lopez explained that Hatfield "was making sense of how everything kind of, like, happened" and agreed the detective seemed to know what had happened "[j]ust like [Lopez] had lived it...." The prosecutor asked, "Detective Hatfield was giving you bits of information that were right on with what actually happened; is that correct?" Lopez answered, "Correct."

Lopez remembered that Hatfield told him multiple times to tell the truth during the interview. Lopez explained that he initially withheld details such as getting the gun from Mariscal "[b]ecause a lot of them, they were going to hurt more to Sanchez, so I was kind of holding back." Lopez testified that he was telling the truth when he told the jury it was Sanchez who killed Schopp.

### c. Detectives

On cross-examination, Sanchez's counsel asked Hedrick why he told Carranza "'Let's fix this'" a number of times throughout the interview. Hedrick testified, "[M]y intent was ... that by telling the truth, he could fix this and kind of lessen" his culpability. Defense counsel asked if that was also why Hedrick said things like "'[m]aybe it was a mistake'" and "'[m]aybe you didn't know it was going to happen.'" Hedrick explained this was an interview technique "to make the situation look less than what it really is to get him to initially just admit to being there." Hedrick agreed that he lied about apprehending Sanchez during Carranza's interview and about the existence of a videotape of Carranza's car at the shooting.

On redirect examination, Hedrick testified that it was common for people to lie before finally acknowledging they were involved in criminal activity. Hedrick believed that Carranza lied at the beginning of the interview and was never 100 percent truthful but some of the things he said about the crime were true. Hedrick testified that he did not try to get specific answers from Carranza other than the truth.

Hatfield testified that he used the GSR test in an effort to encourage Carranza and Lopez to tell the truth.

### B. Analysis

"[D]efendants must allege a violation of their *own* rights in order to have standing to argue that testimony of a third party should be excluded because it is coerced." (*People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett* ).) As Sanchez acknowledges, it is well settled that a defendant has no standing to object to a violation of the Fourth, Fifth, or Sixth Amendment rights of a third party. (*Badgett, supra,* at pp. 343–344.)

Rather, "if the defendant seeks to exclude a third party's testimony on the ground the testimony is somehow coerced or involuntary, '[a]ny basis for excluding [the third party's] testimony must be found in a federal constitutional right *personal* to defendant.' [Citation.] Further, the basis of the claim must be that coercion has affected the third party's trial testimony." (*Badgett, supra,* 10 Cal.4th at p. 344.) "[O]nly when the evidence produced *at trial* is subject to coercion are [a] defendant's due process rights implicated...." (*Ibid.*)

When a defendant seeks to exclude coerced testimony of a witness or codefendant, it is the *defendant's* burden to establish the statement was involuntary. (*People v. Williams* (2010) 49 Cal.4th 405, 453.) Therefore, it was Sanchez's burden to show that Carranza's and Lopez's trial testimony was coerced. The question of coercion, in turn, requires a factual inquiry into the totality of the circumstances. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 78–79 (*Quiroz* ) [considering and rejecting claim that police interrogation of witness rendered testimony coerced where defendant failed to object to witness at trial].) Sanchez has failed to meet his burden.

Carranza and Lopez testified pursuant to plea agreements, but this is not sufficient to show coercion. In *Badgett,* the Supreme Court recognized: "We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced. On the contrary, ... we [have] held that testimony given under an immunity agreement does not violate the defendant's right to a fair trial, if the grant of immunity is made on condition the witness testifies fully and fairly." (*Badgett, supra,* 10 Cal.4th at pp. 354–355.)

This is so even though our Supreme Court has also acknowledged that testifying pursuant to an agreement involves a "certain degree of compulsion." (*People v. Homick* (2012) 55 Cal.4th 816, 862.) The court has explained:

> " ' "[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." [Citation.] Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially

conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is "tainted beyond redemption" [citation] and its admission denies the defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, *it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.*' [Citation.] ... These principles are violated only when the agreement requires the witness to testify to prior statements 'regardless of their truth,' but not when the truthfulness of those statements is the mutually shared understanding of the witness and the prosecution as the basis for the plea bargain. [Citation.]" (*People v. Homick, supra,* 55 Cal.4th at pp. 862–863, italics added.)

In the present case, Sanchez does not claim the plea agreements required Carranza and Lopez to testify in a particular fashion. In addition, Lopez testified as to understanding that his plea agreement required him to "[s]ay the truth." Accordingly, the fact that Carranza and Lopez testified pursuant to plea agreements does not render their testimony coerced.

We also observe that "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17.) Further, "[t]here is nothing improper in confronting a suspect with the predicament he or she is in, or with an offer to refrain from prosecuting the suspect if the witness will cooperate with the police investigation." (*People v. Daniels* (1991) 52 Cal.3d 815, 863.) The police "are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Here, the detectives consistently urged Carranza and Lopez to tell the truth. They also threatened them with prosecution for murder and discussed the possibility of a deal with the district attorney without making any promises. These circumstances do not render Carranza's and Lopez's interview statements coerced.

Sanchez argues his case is very similar to *People v. Lee* (2002) 95 Cal.App.4th 772 (*Lee* ). We disagree. In *Lee,* the victim was shot in the back of the head at point-blank range as he played dice with Saxon. (*Id.* at pp. 776, 781.) At trial, Saxon testified that, upon hearing gunshots, he went into a fetal position and did not see who shot the victim. (*Id.* at p. 781.) The prosecution then played a recording of an interrogation of Saxon by police polygraph examiner Youngblood in which Saxon said that defendant Lee killed the victim. A few minutes later, Saxon also told two police officers that Lee shot the victim. The next day, however, Saxon recanted his statement. (*Ibid.*) At trial, Saxon testified that his statement that Lee was the killer was false and he only made it because Youngblood pressured him to name Lee as the killer or face trial for the murder himself. (*Id.* at p. 782.)

The Court of Appeal concluded that police coercion by Youngblood made Saxon's prior statement to the police inherently unreliable. (*Lee, supra,* 95 Cal.App.4th at p. 782.) Saxon had voluntarily gone to the police station to be interviewed about the shooting. Youngblood administered a polygraph examination during which he asked if Saxon shot the victim. (*Ibid.*) Youngblood then told Saxon there was a 97 percent probability he was the person who shot the victim. (*Id.* at p. 783.) "Youngblood proceeded to threaten Saxon with a first

degree murder prosecution unless he identified defendant as the killer." (*Ibid.*) "Youngblood told Saxon: 'So right now there's no question in my mind either you are the one that pulled that trigger or [Lee] and you pulled that trigger. Okay. What I am going to tell you now, before this thing gets too far out of hand, work with me or work against me. That's where you are, where you are. Now, that's the reality of it.' Saxon replied, 'I'm with you.' " (*Id.* at p. 784.) Youngblood also suggested a motive for Lee killing the victim, telling Saxon that the victim was seeing Lee's girlfriend. (*Ibid.*)

Youngblood continued: " 'The thing is, you got caught up in the middle of this thing. Okay if you didn't shoot the man yourself. I am going to tell you now I want everything. Because if I run you back on this thing again and it still shows that you are the person who shot him, I am going to walk out of here without giving you the results. I will personally write my report today. And turn it in. Okay? Now, if you did shoot the man, I want to know why and what really happened. So I am asking you now, I don't [care] how scared you are. Did you shoot him?' " (*Lee, supra,* 95 Cal.App.4th at pp. 784–785, italics omitted.) Saxon responded that he did not do it. Youngblood then said: " 'But you know who did. And you know what happened out there and you are afraid because somebody is going to put a snitch jacket on you.' " (*Id.* at p. 785.) Saxon said, " '[Lee] shot him.' " (*Ibid.,* italics omitted.)

The *Lee* court acknowledged, "California courts have long recognized it is sometimes necessary to use deception to get at the truth." (*Lee, supra,* 95 Cal.App.4th at p. 785.) For example, where a police officer falsely told a suspect that his fingerprints were found on the getaway car, the suspect's subsequent confession was admissible. (*People v. Watkins* (1970) 6 Cal.App.3d 119, 125.) Similarly, the false statement that the defendant had been positively identified did not render the defendant's confession inadmissible. (*People v. Pendarvis* (1961) 189 Cal.App.2d 180, 186.)

In *Lee,* however, the court concluded: "Youngblood went beyond mere deceit as to the evidence pointing to Saxon as the killer. He also went beyond merely exhorting Saxon to tell the truth. He even went beyond threatening Saxon with prosecution for first degree murder unless he named the real killer. [¶] Youngblood in essence told Saxon: We will prosecute you for first degree murder unless you name [Lee] as the killer." (*Lee, supra,* 95 Cal.App.4th at p. 785.)

The court further noted that Saxon was not *Mirandized* until after he was told there was a 97 percent probability that he was the killer. (*Lee, supra,* 95 Cal.App.4th at p. 786.) Under the circumstances of the case, the court concluded: "[T]he interrogation of Saxon was not designed to produce the truth as Saxon knew it but to produce evidence to support a version of events the police had already decided upon. In this respect, the police crossed the line between legitimate interrogation and the use of threats to establish a predetermined set of facts." (*Ibid.*)

The present case is easily distinguishable from *Lee*. First and foremost, in *Lee,* the witness Saxon recanted his statement and expressly testified that he only named Lee as the killer because of pressure from Youngblood. Here, in contrast, Carranza and Lopez did not recant their initial statements to the police and testified at trial that Sanchez shot Schopp. Thus, unlike *Lee,* there is no evidence that Carranza and Lopez subjectively felt pressure to identify Sanchez falsely as a participant in the shooting.

Further, in *Lee,* Youngblood threatened that he would prosecute Saxon *unless* he named Lee as the killer. Here, the detectives did not present a similar either/or threat to Carranza and Lopez. In other words, they were not told that either Sanchez was going to be charged with murder or they were. Instead, the detectives suggested that all three were involved in the shooting and urged them to tell the truth about what happened. They were not led to believe they could avoid criminal prosecution altogether by naming Sanchez as the shooter. Indeed, *after* Carranza and Lopez identified Sanchez as the one who fired the gun, they were charged with the same crimes that Sanchez was charged with.

Nor did the questioning demonstrate a similar intent on the part of the detectives to produce statements conforming to a version of events they had already decided on. In Carranza's interview, in particular, Hedrick did not even know who the passengers in the Expedition were when he began the interview. He learned who they were and where to find them from Carranza. At one point, Hedrick asked whether Sanchez shot "or was it someone else in [the] car," indicating that he had not already decided that Sanchez was the shooter but was trying to elicit the facts from Carranza. While it is true that Hatfield told Lopez his understanding of the crime (Carranza was the driver, Sanchez was the shooter, and Lopez was the passenger), this was based on evidence, that is, Carranza's statement to Hedrick. "It is well settled that law enforcement may confront a witness with what they know." (*Quiroz, supra,* 215 Cal.App.4th at p. 79.) We have reviewed the interview transcripts and video, and they do not demonstrate the detectives questioned Carranza and Lopez only "to establish a predetermined set of facts" as was the case in *Lee.* (*Lee, supra,* 95 Cal.App.4th at p. 786.)[n.11]

> [n.11] To the extent Sanchez argues that Mariscal coerced Lopez and Carranza into giving statements that matched a "predetermined set of facts" (*Lee, supra,* 95 Cal.App.4th at p. 786), we reject the argument. Mariscal did tell them they were leaving out details—such as where the gun came from—but he did not tell them how to answer his questions. The transcripts show that Lopez told Mariscal where Sanchez picked up the gun, and Carranza gave a similar description of the place where they got the gun. Lopez's and Carranza's stories did differ in certain details. For example, Lopez said they went to Chicken Legs's place and Carranza said they did not. But this does not show Mariscal tried to coerce them into making statements as to a predetermined set of facts. He simply asked Carranza questions about details he had learned from Lopez. He did not attempt to force Carranza to give a statement that conformed with Lopez's.

In addition, Saxon was not *Mirandized* before he was told there was a 97 percent probability that he was shooter. (*Lee, supra,* 95 Cal.App.4th at p. 786.) Here, Carranza and Lopez were read their *Miranda* rights before they were told about the (nonexistent) surveillance video from the market or were given the GSR test. We also reiterate that the *Lee* court recognized police deception is sometimes necessary "to get at the truth." (*Lee, supra,* at p. 785.) In general, "[p]olice trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) Thus, the fact that Hedrick and Hatfield used deception and techniques that could be described as "trickery" does not by itself render Carranza's and Lopez's interview statements involuntary or coerced. In sum, the present case is not similar to the situation in *Lee,* and Sanchez's reliance on *Lee* to show that Carranza's and Lopez's testimony was coerced is misplaced.

Sanchez has failed to establish Carranza's and Lopez's trial testimony was coerced. We have reviewed the trial transcripts and previous interviews in detail, and the totality of the circumstances supports the conclusion that Carranza's and Lopez's testimony was admissible. As a consequence, it was not ineffective assistance for the trial counsel not to move to exclude their testimony. (*People v. Berry, supra,* 224 Cal.App.3d at p. 170.)

Cardenas, 2014 WL 2735968, at *6–19 (footnote omitted).

1. Strickland Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in

25

tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt." <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1376 (2015) (quoting <u>Burt v. Titlow</u>, 134 S. Ct. 10, 13 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S. at 105.

2.   <u>Analysis</u>

Petitioner asserts that he was deprived of effective assistance when trial counsel failed to request that the trial court exclude the testimony of Isidro Carranza and Rafael Lopez. (ECF No. 1 at 26). Petitioner argues that Carranza's and Lopez's in-court testimony should have been excluded based on unreliability because: (1) their prior statements and in-court testimony were generated by police and prosecution coercion, and (2) the substance of their statements and testimony was suggested to them by interrogators before they stated it themselves. (<u>Id.</u> at 28).

Here, the merits of Petitioner's claim that Carranza's and Lopez's testimony should have been excluded "control the resolution of the <u>Strickland</u> claim because trial counsel cannot have been ineffective for failing to raise a meritless objection." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005). Generally, a defendant does not have standing to challenge a violation of a third party's rights. <u>See</u> <u>Douglas v. Woodford</u>, 316 F.3d 1079, 1092 (9th Cir. 2003); <u>People v. Badgett</u>, 10 Cal. 4th 330, 343 (1995). However, admission of a third party's coerced testimony can render a trial so fundamentally unfair as to violate due process. <u>Williams v. Woodford</u>, 384 F.3d 567, 593 (9th Cir. 2004) (citing <u>Karis v. Calderon</u>, 283 F.3d 1117, 1129 n.5 (9th Cir. 2002); <u>Badgett</u>, 10 Cal. 4th at 344–48.

**a.  Plea Agreements**

"The general rule is that an accomplice who has pled guilty may testify against non-pleading defendants without raising due process concerns." <u>Morris v. Woodford</u>, 273 F.3d 826, 836 (9th Cir. 2001) (internal quotation marks omitted) (quoting <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1537 (9th Cir. 1988)). "An agreement that requires a witness to testify truthfully in

exchange for a plea is proper so long as 'the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care.'" Allen v. Woodford, 395 F.3d 979, 995 (9th Cir. 2005) (quoting Yarbrough, 852 F.2d at 1537). In the instant case, both Carranza and Lopez testified pursuant to plea agreements. (1 RT[5] 171; 2 RT 239). The jury was informed of the nature of the agreements and defense counsel had the opportunity to cross-examine both Carranza and Lopez regarding the agreements. The jury also was instructed to weigh Carranza's and Lopez's testimony with caution. (2 CT 293–94). Accordingly, the state court's determination that Carranza's and Lopez's plea agreements did not render their testimony coerced was not objectively unreasonable.

### b.  Interview Statements to Detectives and Investigator

A coercive interrogation exists when the "totality of all the surrounding circumstances" shows that a suspect's "will was overborne." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The detectives' and the investigator's repeated exhortations that Carranza and Lopez tell the truth were not coercive *per se*. See Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003) (citing Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997) (stating officer's repeated insistence that the suspect tell the truth did not amount to coercion)). The detectives' statements regarding the likely charges and potential penalties were not coercive *per se*. See United States v. Okafor, 285 F.3d 842, 847 (9th Cir. 2002) ("We have held that 'recitation of the potential sentence a defendant might receive does not render a statement involuntary.' . . . Those who do a crime may have to pay in time; and we do not hesitate to say that law enforcement may bring this to the suspect's attention.") (quoting United States v. Bautista-Avila, 6 F.3d 1360, 1365 (9th Cir. 1993)). The detectives' lies regarding a video recording from the market and Petitioner's alleged admissions were not coercive *per se*. See United States v. Preston, 751 F.3d 1008, 1026 (9th Cir. 2014) ("Assuredly, interrogating officers can make false representations concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced.") (citing Frazier v. Cupp, 394 U.S.

---

[5] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on December 24, 2015. (ECF No. 19).

731, 739 (1969)). The detectives' comments that Carranza and Lopez had to be totally truthful if they wanted the District Attorney ("DA") to try to work a deal and the detectives' statements that they would inform the DA of Carranza's and Lopez's cooperation were not coercive *per se*. See United States v. Coleman, 208 F.3d 786, 791 (9th Cir. 2000) (citing United States v. Leon Guerrero, 847 F.3d 1363, 1366 (9th Cir. 1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect.")). The detectives' comments urging Carranza and Lopez to think of their families were not coercive *per se*. See Ortiz v. Uribe, 671 F.3d 863, 872 (9th Cir. 2011) (holding not to be unreasonable the state court's determination that a habeas petitioner had not been coerced by a detective's statements that he had an obligation to his family to tell the truth and that his children were counting on him to do the right thing); Brown v. Horell, 644 F.3d 969, 981–82 (9th Cir. 2011) (holding not to be unreasonable the state court's determination that a habeas petitioner had not been coerced by a polygraph examiner's statements that he would need to tell the truth in order to see his unborn child).

The Supreme Court has recognized that "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, difficult to draw." Hayes v. Washington, 373 U.S. 503, 515 (1963). Based on the foregoing, it was not objectively unreasonable for the state court to determine that, considering the totality of the circumstances, Lopez and Carranza's interview statements were not coerced.

### c.   In-Court Testimony

In the petition, Petitioner "does not claim that the state employed coercive tactics at the time of trial or immediately before trial in order to secure [Carraza's and Lopez's] trial testimony. Thus . . . the question before us is whether the post-arrest coercion of a government witness so tainted that witness's trial testimony as to render the testimony's admission a violation of the defendant's right to due process." Williams, 384 F.3d at 594. The Court considers factors such as the passage of time between the coercion and the trial testimony and whether intervening circumstances sufficiently insulated the testimony from the effect of the prior coercion. Id. at

595. Additionally, the fact that a witness is represented by counsel "provide[s] some safeguard for the truth of [the witness's] trial testimony." Id. at 596 (citing Cooper v. Dupnik, 963 F.2d 1220, 1240 (9th Cir. 1992) (en banc) ("The presence of a lawyer can . . . help to guarantee that . . . a fully accurate statement [is given] to the police and that the statement is rightly reported by the prosecution at trial.")).

As discussed earlier, Carranza's and Lopez's interview statements were not coerced. Almost three years elapsed between the interviews with detectives on July 30, 2009, and when Carranza and Lopez testified at Petitioner's trial in July 2012. (3 RT[6] 549; 5 RT 813; 1 CT[7] 225–26, 228–29). Approximately seven months elapsed between the interviews with the investigator in December 2011 and when they testified at Petitioner's trial. (2 RT 436–37). Carranza and Lopez were represented by attorneys in this case. (1 RT 171–72; 2 RT 293). At trial, Carranza and Lopez were subjected to cross-examination, through which defense counsel elicited details of their interviews, their incentives to cooperate and testify, and their inconsistent statements. (1 RT 171–97; 2 RT 202–06, 228–33; 3 RT 366–77, 386–92, 396–401). Moreover, videos of Carranza's and Lopez's interviews with the detectives were shown to the jury, and defense counsel questioned Carranza and Lopez regarding what was shown in the videos. (1 RT 187–97; 2 RT 202–06; 3 RT 370–77, 386–92, 396–400). Thus, Petitioner was able to test thoroughly whether Carranza's and Lopez's testimony was voluntary and truthful, and the jury could assess the credibility of the witnesses in light of the pretrial interviews and their plea agreements. Accordingly, the state court's determination that Carranza's and Lopez's in-court testimony was not coerced was not objectively unreasonable. See Williams, 384 F.3d at 596 (holding no due process violation when witness, who allegedly had been beaten, threatened with a murder charge, and offered immunity during a prior interrogation, testified at trial because two years had passed since illegal interrogation and witness was represented by counsel); United States v. Mattison, 437 F.2d 84, 85 (9th Cir. 1970) (per curiam) (holding no due process violation when witness, who previously was illegally interrogated, testified at trial because "psychologically coercive

---

[6] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on December 24, 2015. (ECF No. 19).
[7] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on December 24, 2015. (ECF No. 19).

atmosphere of that interrogation must surely have dissipated" by the time of trial, there was no indication that the witness was told what he should say on the witness stand, and the witness's testimony "was made in open court, subject to cross-examination, where the jury could observe his demeanor and gauge his credibility.").

Having "reviewed the trial transcripts and previous interviews in detail," the state court found that "the totality of the circumstances supports the conclusion that Carranza's and Lopez's testimony was admissible. As a consequence, it was not ineffective assistance for the trial counsel not to move to exclude their testimony." Cardenas, 2014 WL 2735968, at *19. Based on the foregoing, the state court's denial of Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. Accordingly, Petitioner is not entitled to habeas relief on his first claim.

### B. Admission of Unreliable Coerced Testimony

In his second claim for relief, Petitioner raises a separate due process claim regarding the admission of Carranza's and Lopez's testimony. (ECF No. 1 at 28). In the California Court of Appeal, Petitioner had asked the court to "consider the merits of his due process claim under the rubric of his claim of ineffective assistance of counsel." (LD 1 at 41). In his petition for review filed in the California Supreme Court, Petitioner raised separate claims for ineffective assistance of counsel and violation of due process. (LD 7).

As discussed in section IV(A)(2), *supra*, the state court's determination that Carranza's and Lopez's interview statements and trial testimony were not coerced was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. Accordingly, Petitioner is not entitled to habeas relief on his second claim.

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

///

1    This Findings and Recommendation is submitted to the assigned United States District

2   Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

3   Rules of Practice for the United States District Court, Eastern District of California. Within

4   **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

5   written objections with the court and serve a copy on all parties. Such a document should be

6   captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

7   objections shall be served and filed within fourteen (14) days after service of the objections. The

8   assigned United States District Court Judge will then review the Magistrate Judge's ruling

9   pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within

10  the specified time may waive the right to appeal the District Court's order. Wilkerson v.

11  Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th

12  Cir. 1991)).

13

IT IS SO ORDERED.
14

15   Dated:   __August 19, 2016__            /s/ Erica P. Grosjean

16                                          UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28